*331 Opinion of the Court, by
Judge Owsley.
ON the 18th of January 1776, John Bailey made and published his last will and testament, containing, among others, the following bequests: “ I lend unto my wife, Elizabeth, the plantation whereon I now live, containing 140 acres. I likewise lend her one negro girl, named Easter, during her natural life, and after her decease to return to my grandson, Stephen Bailey, to him and his heirs male, forever; and for want of such heirs, the said land and negroes to return to the heir at law.”
After the death of John Bailey, the testator, and whilst the negro, Easter, remained in possession of his widow, under the will, she had a child, called Sampson.
The grandson, Stephen Bailey, thereafter, in June 1794, made and published his will, containing the following bequests: “ I give unto my well beloved sister, Elizabeth Bailey, all that tract or parcel of land which was given to me by my grandfather’s will, whereon Elizabeth Atwood now lives, by estimation 140 acres; likewise, one negro man, known by the name of Dick; also, one negro woman named Easter; also, one negro boy named Sampson, to her and her heirs for ever.”
The testator, Stephen Bailey, then departed this life, leaving the widow of his grandfather, John Bailey, still living. The sister and devisee, Elizabeth, subsequently married Thomas Weeden, and after having by him one child, William Weeden, also died in the lifetime of the widow of the testator, the grandfather, John Bailey. Thomas Weeden, the husband of Elizabeth, some time after her death, also departed this life, leaving the widow of John Bailey still living, and without ever having obtained the possession of either the negro woman, Easter, or her child Sampson, which were willed to his wife by her brother Stephen.
Subsequent to the death of Thomas Weeden, and in the year 1811, Elizabeth Bailey likewise departed this life, and the negroes, Easter and Sampson, were, by *332 George Pinkard, taken into his possession as guardian for William Weeden, the only son of Thomas and Elizabeth Weeden.
It is to the act of 1785 the above mentioned act of 1798 refers by its true title; the act of 1796 bears a different title, viz. An act to reduce into one the several acts directing the course of descents.
Where an infant dies without issue and intestate, his slaves pass in equal moieties to his collateral kindred in both lines, without any regard to the side from which his title accrued.
Where all the relations on one side are of the half-blood, they shall nevertheless be entitled, collectively, to a moiety of the estate.
The clause restricting the portions of the half-blood to half as much as the whole blood, must be understood to apply to the half-blood on the part of the same ancestor.
*332 Having thus obtained the possession of the negroes, Pinkard held them as guardian for William Weeden, until the thereafter, in his minority and without issue, departed this life.
After the death of William Weeden, and whilst Pinkard held the possession of the negroes, he applied to Smith and wife, the present appellees, and purchased from them their interest in the personal estate and slaves of William Weeden, for the sum of sixty dollars paid in hand, forty dollars to be paid at a named day, and one hundred dollars to be paid if it should be ascertained that James Bailey, the brother of Mrs. Smith, was dead.
Pinkard then sold the negro Sampson to Benjamin Whaley, received part of the price in hand, and took for the residue.
Subsequent to this, Pinkard offered to pay Smith and wife the forty dollars remaining unpaid on account of purchase from them; but they refused to receive it, and demanded a cancelment of the contract. Pinkard, however, refused to cancel the contract, and this suit was brought in equity, by Smith and wife, as well to set aside the contract, as to compel Pinkard to account, as guardian for William Weeden, deceased, and to obtain from Pinkard and Whaley a surrender of the possession of the negroes, Easter and Sampson.
The bill charges that Mrs. Smith and James Bailey of Virginia, are the nearest of kin to William Weeden, deceased, on the part of his mother, and insists that they are entitled to all that part of the estate of William Weeden, which had been willed to his mother by Stephen Bailey, her brother. The bill alleges, that when Smith and wife made the contract with Pinkard, they were ignorant of their right to the estate, and, confiding in Pinkard, were induced by his false and fraudulent representations, to believe that others pretending claim had the superior right; that when the application was made by Pinkard, to purchase, he was charged with the care of a letter, written by a friend to Mrs. Smith, informing her of the nature of her right; but, to enable him the more effectually to accomplish his fraudulent purpose, he withheld the letter until the *333 contract was closed; that during the time of contracting, Pinkard informed Smith and wife, that, as guardian to William Weeden, he held, of the profits of the estate, not more than about thirty dollars; whereas in fact he was in arrear to the estate several hundred dollars. The bill, moreover, charges that Pinkard well knew the estate of right belonged to Smith and wife, and James Bailey, and when he afterwards sold the negro Sampson, Whaley, the purchaser, was informed of the fraud practised by him in making the purchase from Smith and wife. Pinkard, Whaley and James Bailey are all made defendants, and the bill prays the appropriate relief, &c.
The reference in the act of 1797, to the act directing the course of descents, applies to the act of 1786, uncontrolled by the act of 1790 of the 5th and 6th sections of the act of 1796.
Where an infant dies intestate and without issue, his personal estate passes in equal moieties to his collateral kindred in both lines, without any regard to the side from which he acquired it.
A contract cancelled on account of ignorance of his rights in the seller, a fraudulent concealment by the purchaser, and inadequacy of price.
*333 Pinkard denies the alleged fraud, charges that Smith and wife, when the contract was made, knew of their right, and insists it was a risking bargain, and that a court of equity ought not to interpose.
Whaley denies having any knowledge of the fraud alleged to have been committed by Pinkard, alleges that he is a purchaser for a full and fair price, and has paid the greater part of the purchase money, and insists that if any fraud were committed by Pinkard, he not to be affected it.
James Bailey admits that Mrs. Smith and himself are the legal heirs of William Weeden, deceased, contends that he is entitled to a moiety of the estate, and asks for a decree securing to him an interest to that extent.
The court below pronounced an interlocutory decree, directing the contract of purchase by Pinkard from Smith and wife, to be cancelled, and directing an account of Pinkard’s guardianship to be taken by commissioners the court, &c.
The commissioners accordingly made their report, and a final decree was pronounced in favor of Smith and wife, and James Bailey, for the negroes and the balance reported by the commissioners to be due from Pinkard as guardian, &c. To reverse that decree, Pinkard’s executors (he having departed this life, and the suit being revived against them,) and Whaley have prosecuted this writ of error with supersedeas.
Preliminary to enquiring into the fraud alleged to have been committed by Pinkard, in making the purchase from Smith and wife, it is proper we should examine into the right which they assert to the estate, as *334 the heirs at law of William Weeden, deceased. That, at the time of making his will, Stephen Bailey held a vested remainder in fee simple, in the estate which had been devised to him by the will of his grandfather, we apprehend, there can be no doubt. According to the ancient doctrine of the law, the will of the grandfather, John Bailey, would not be construed to vest in Stephen such an estate in the lands devised; not, however, in consequence of that clause in the will which directs the estate to return to the heir, in case of no heirs male of Stephen, but because under the devise to Stephen Bailey and his heirs male forever, Stephen would be construed to take an estate tail; and the clause directing the estate to return to the heir, for the want of heirs male of Stephen, would be rejected as inoperative, in consequence of the remoteness of the contingency on which the return of the estate to the heir is made to depend. It is true, in the devise to Stephen Bailey no express words of procreation are employed; and generally, the word body, or some such word of procreation, is said to be necessary to create an estate tail. But words of procreation are not, in all cases, necessary. Without some such words, an estate tail could not be created by deed; but greater indulgence has always been allowed in last wills and testaments, and a devise to a man and his heirs male, has been held equivalent to a devise to him and the heirs male of his body. Co. Litt. 26, 3 Salk. 336.
These observations have been made with exclusive reference to the land devised to Stephen; and this has been done, not because we suppose a different rule of construction should prevail as to the negroes, but because words which, if applied to land, create only an estate tail, will, when applied to negroes, vest the absolute estate in fee simple, unless the negroes be attached to the land, and thereby pass with the land, subject to all its conditions.
Whether, however, by the will of John Bailey, the negroes are attached to the land, cannot be important in the present contest; for, admitting they were so attached, and that Stephen took but an estate tail in the remainder, in the negroes as well as the land, yet by an act of the Virginia legislature, in force before the date of his will, that estate was converted into a remainder in fee simple.
*335 The estate in remainder thus held by Stephen Bailey, at his death passed by his will to his sister Elizabeth, and as she was then covert, the right immediately, by operation of law, vested in her husband, Thomas Weeden. Thus it is said, such chattels as are given to the wife after marriage, shall belong to the husband, and he shall be entitled to them, although they had not come to his possession at her death. So it has been held, that if a legacy be left to a wife, to be paid twelve months after the testator’s death, and the wife die within that period, her husband is entitled to it. Toller’s Law Ex. 224; Com. Dig. title Baron and Feme, E. 3. We would not, however, be understood as deciding that the right so vested in the husband, as that the wife would not have been entitled to it as the surviver, if she had survived her husband; but it is intended to say, that as the surviver of his wife, Thomas Weeden, the husband, might, if the particular estate in the slaves had expired in his lifetime, have recovered the slaves by suit in his own name, without administering on the estate of his wife. In speaking on this subject, Chitty, in his treatise on Pleadings, (vol. 1, p. 20,) observes, “ If the husband survives, there is a material distinction between chattels real and choses in action. The husband (says he) is entitled to the chattels real by survivership, and to all rent, &c. accruing during coverture. He is also entitled to all chattels given to the wife during coverture, in her own right, though not to her rights in autre droit. And choses in action, or contracts made with the wife before coverture, except arrears of rent, do not survive to the husband, and he must, to recover them, sue as administrator to the wife.”
But notwithstanding the husband, as he survived his wife, might have maintained an action in his own name to recover the slaves, it does not thence follow, that the wife would not have been entitled to them as surviver of the husband, had he died before her. To recover the slaves during coverture, the suit might have been brought either in the name of the husband alone, or in the name of the husband and wife. (Toll. Ex. 218.) And it is a general rule, that wherever the suit may be brought either in the name of husband and wife, or in the name of the husband, the right will survive to the surviver.
2 Dig. 1156.
These observations have been made on the supposition that interest which a husband gains in the slaves accruing to the wife during coverture, is to be regulated by the principles of the common law in relation to chattels; and that we have supposed, because we infer that the statute of this country has placed slaves, as to the husband’s interest, on the footing of chattels. The statute of this country to which we allude, (2 Litt. 121,) was taken from a statute of Virginia in force at the separation, and by the appellate court of that country, this statute has been construed to place slaves on a level with chattels accruing to the wife during coverture. Accordingly, in 2d Call 447, it was held that slaves devised to the wife during coverture, and not reduced to the husband’s possession otherwise than in his right of executor of the devisor, survived to the wife. So, in a subsequent case, (2 Hen. and Mun. 381,) the principle was fully recognized, that on the death of the husband during the existence of a particular estate in slaves, the remainder to which the wife was entitled in her right during coverture, survived to her.
Except for the purpose of ascertaining the proper parties to the present contest, it is not, however, material whether Thomas Weeden, the husband, was entitled to the remainder in the slaves, merely as surviving husband, or in virtue of his right to administer on the wife’s estate. In either case, it is obvious that the beneficial interest must, at his death, have descended from him to his son, William Weeden. If the right vested in him as husband, it must, of necessity, have descended from him; and if, in consequence of his right to administer, he was invested with the right, it is well settled, that his representatives, and not the representatives of his wife, are entitled to it. See Harg. note 1 to Co. Litt. 351, and the authorities there cited.
If, then, we are correct in supposing that William Weeden took the beneficial interest in the slaves by descent from his father, it is perfectly clear, that Mrs. Smith and James Bailey are not entitled to the whole interest.
If the descent from William were regulated by the act of this country of 1796, entitled “ an act to reduce into one the several acts directing the course of descents,” [1 Dig. 438,] Mrs. Smith and James Bailey would not be *337 entitled to any part of the slaves; for, as William died under the age of twenty-one years, leaving a brother of his father living, his collateral kindred on the part of his mother could not, according to the act of 1796, succeed to any part of his estate derived by descent from his father, and Mrs. Smith and James Bailey not only assert their claim as the next of kin on the side of the mother of William Weeden, but they are also proved to be of the half blood on that line.
2 Dig-1155.
1 Dig. 435.
It is not, however, by the act of 1796, the descent from William must be regulated. We have a statute in this country, directing the manner slaves shall descend, and it is by that act the descent should be tested. That statute declares that slaves shall descend to the heirs and widow of persons departing this life, as lands are directed to descend, in and by an act of the general assembly, entitled “ an act directing the course of descents.” 2 Litt. 120.
The act thus referred to and adopted as the rule for the descent of slaves, is not that of 1796, but one enacted by the legislature of Virginia at the session of 1785; and that act contains no provision, such as of 1796, confining the descent of infants’ estates to the line of the ancestor from whom the infant derived it. But, according to the provisions of the act of 1785, the estate of William must have passed in equal moieties to his collateral kindred on the part of both father and mother.
It results, therefore, as Mrs. Smith and her brother James are the nearest of kin on the part of the mother, that they must have inherited that moiety of the slaves and personal property, which, by the act, is directed to pass in the maternal line. The circumstance of there being a brother of the father, of the whole blood, does not, we apprehend, affect the extent of the interest of Mrs. Smith and her brother. They would not have been entitled to more than half portions, if there had been any of the whole blood, in equal degree with them, on the part of the mother; but the statute expressly declares, that in passing to the collateral kindred, the inheritance shall be divided in two moieties, one of which shall go to the paternal, and the other to the maternal kindred; and that clause in the statute, which restricts the portion of the half-blood to half as much as that of the whole blood, must be understood to *338 apply to the half-blood on the part of the same ancestor, and should not be construed to invest the collateral kindred of the whole blood of either ancestor, with any part of the moiety which is directed to pass to the kindred of the other.
1 Dig. 527.
1 Dig. 437.
We have said that Mrs. Smith and her brother inherited a moiety of personal estate, as well as the slaves; but we have so said, not because we suppose the act cited from 2 Littell 120, applies as well to personal estate as to slaves, but because by the act of 1797 (1 Litt. 318) concerning the distribution of intestates’ estates, &c. the surplus of personal estate of persons dying intestate, after paying debts, &c. is directed to be distributed in the same proportions, and to the same persons, as lands are directed to descend, in and by an act of the general assembly entitled “ an act directing the course of descents.”
It is true, that the act of this country of 1796, concerning descents, contains no provisions which were not previously in force, and is entirely composed of the provisions of the act of 1785, entitled “ an act directing the course of descents,” and an act amendatory thereto, which passed in Virginia, at the session of 1790. But the amendatory act of 1790, which contains the provision inserted in our act of 1796 concerning the descent of infants’ estates derived from their ancestor, has never been held, in that state, to control the distribution of personal estate or slaves; but, to the contrary, after the passage of the amendatory act of 1790, and under a provision contained in another act of 1785, precisely like that which we have referred to, for the distribution of personal estate, the appellate court of that state determined that the distribution must be regulated by the act of 1785 concerning descents. 1 Mun. 183. We are aware that a different opinion was intimated by this court in the case of Lytle vs. Rawton, 1 Marsh. 517; but that case ultimately turned on a different point, and on further examination and reflection, we are convinced that the opinion then expressed does not so well accord with the provisions of the several acts, as the construction for which we now contend.
Smith and wife, having thus shown themselves entitled to one half of a moiety of the slaves and personal estate of William Weeden, deceased, we are brought *339 to examine the grounds relied on by them for a cancelment of the contract of sale made to Pinkard. That the contract ought to be cancelled, we entertain no doubt. It will be perceived, that Smith and wife have not maintained their right to as much of the estate as they claim by their bill; but that part to which they have established a right, far exceeds in value the price which, by the contract, Pinkard was to give. The inadequacy of price might not, however, of itself, unaided by any other circumstance, have formed sufficient cause to set aside the contract; but when it is perceived, as is shown in the record, that Pinkard had been the guardian of William Weeden, and had in his hands the estate; when it is discovered that Smith is a man of extremely imbecile mind, was ignorant of the extent of the estate held by Pinkard, and placed full confidence in Pinkard’s representations concerning the estate; and when it is ascertained that at the time of making the purchase, instead of frankly disclosing the true situation of the estate, Pinkard not only falsely represented the estate in his possession to be of much less value than from the evidence it is proved to be, but withheld, until after he had effected the purchase, a letter addressed by a friend to Mrs. Smith on the subject of the estate, and confided to his care; when all these circumstances are perceived, this court can have no hesitation in pronouncing that the contract was unfairly and unrighteously procured. It was, therefore, correct to decree the contract to be cancelled; but Smith and wife should have been compelled to account for the purchase money received by them, and no decree should have been rendered in their favor, for any part of the estate of William Weeden, deceased, until his personal representative, and the next of kin on the part of his father, were brought before the court, or some sufficient, cause for failing to make them parties to the suit, shown to the court.
The decree must be reversed with costs, the cause remanded to the court below, and unless the complainants there shall cause the personal representatives of William Weeden, and his next of kin on the part of his father, to be brought before the court in reasonable time, to be given by the court, or show sufficient cause for not making them parties, their bill, so far as it goes for an account and partition of the estate of William *340 Weeden, must be dismissed without prejudice to another suit. Such other and further proceedings must also be there had, as may not be inconsistent with the principles of this opinion.